# EXHIBIT A

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

WESTINGHOUSE ELECTRIC
COMPANY LLC,

                Plaintiff,

    v.

DATADIRECT NETWORKS, INC.,

                Defendant.

CIVIL DIVISION

No.: GD: 19-

Code No.: 010

**COMPLAINT**

Filed on behalf of PLAINTIFF

Counsel of Record for these Parties:

ERIC G. SOLLER
Pa. Id. No. 65560

FRANK H. STOY
Pa. Id. No. 314588

Pietragallo Gordon Alfano Bosick
 & Raspanti, LLP
The Thirty-Eighth Floor
One Oxford Centre
Pittsburgh, PA  15219
412-263-2000
egs@pietragallo.com
fhs@pietragallo.com

**JURY TRIAL DEMANDED**

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| WESTINGHOUSE ELECTRIC COMPANY LLC, | CIVIL DIVISION |
| Plaintiff, | No.: GD: 19- |
| | Code No. 010 |
| v. | **JURY TRIAL DEMANDED** |
| DATADIRECT NETWORKS, INC., | |
| Defendant. | |

## <u>NOTICE TO DEFEND</u>

YOU HAVE BEEN SUED IN COURT. If you wish to defend against the claims set forth in the following pages, you must take action within TWENTY (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

**LAWYER REFERRAL SERVICE**
**The Allegheny County Bar Association**
**11th Floor Koppers Building, 436 Seventh Avenue**
**Pittsburgh, Pennsylvania 15219**
**Telephone: (412) 261-0518**

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| WESTINGHOUSE ELECTRIC COMPANY LLC, | CIVIL DIVISION |
| Plaintiff, | No.: GD: 19- |
| | Code No. 010 |
| v. | **JURY TRIAL DEMANDED** |
| DATADIRECT NETWORKS, INC., | |
| Defendant. | |

## COMPLAINT

Plaintiff Westinghouse Electric Company LLC, by and through its undersigned counsel Pietragallo Gordon Alfano Bosick & Raspanti, LLP, files the within Complaint in Civil Action, and in support thereof avers as follows:

## PARTIES

1.      Plaintiff Westinghouse Electric Company LLC ("Westinghouse") is a corporation organized under the laws of the State of Delaware, with a principal place of business at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066. Relevant to this dispute, Westinghouse also does business in Allegheny County at 4350 Northern Pike, Monroeville, Pennsylvania 15146.

2.      Defendant DataDirect Networks, Inc. ("DDN") is a corporation organized under the laws of the State of Delaware, with a principal place at business of 9351 Deering Avenue, Chatsworth, California 91311. DDN regularly conducts business in Pennsylvania.

## JURISDICTION AND VENUE

3.      This Court may exercise general personal jurisdiction over DDN under 42 Pa.C.S.A. § 5301(a)(2) because DDN qualifies as a foreign corporation under Pennsylvania law,

and DDN carries on a continuous and systematic part of its general business within Pennsylvania.

4.      Further, this Court may exercise specific personal jurisdiction over DDN under 42 Pa.C.S.A. § 5322 because DDN contracted with Westinghouse to provide the products at issue in this Commonwealth.

5.      Venue is appropriate in Allegheny County under Rule 2179(a)(2) and (4) of the Pennsylvania Rules of Civil Procedure because Allegheny County is a county where DDN regularly conducts business, and because Allegheny County is where the transaction or occurrence took place out of which this cause of action arises.

### NATURE OF THE ACTION

6.      Westinghouse provides a wide range of nuclear power plant products and services to utilities throughout the world, including advanced nuclear plant designs, nuclear fuel, service and maintenance, and instrumentation and control systems.

7.      In support of its global operations, Westinghouse generates a significant volume of proprietary, commercially sensitive data. The ability to securely and reliably store this data is essential to the operation of Westinghouse's business.

8.      With regard to its operations in Southwestern Pennsylvania, Westinghouse maintains primary storage of its data at its Monroeville Data Center. That data is replicated and stored in backup at Westinghouse's Cranberry location. This is done in the event of a failure of the primary storage to ensure that crucial data is not lost. This "disaster recovery" function is essential to Westinghouse.

9.      In or about January 2018, the support agreement for one of Westinghouse's data storage platforms – the Dell Isilon system – was due to expire. Westinghouse determined that it

would be more cost-effective to replace the Dell Isilon system, which had fully depreciated, rather than extend the support agreement.

10.     One of the alternative data storage solutions that Westinghouse evaluated to replace the Dell Isilon system was offered for sale by DDN.

11.     DDN describes itself as "the leading big data storage supplier to data-intensive global organizations." (*About Us – DDN.com*, https://www.ddn.com/company/about-us/ (last visited Sept. 30, 2019).) DDN offers both cloud-based and onsite data storage solutions to companies, research institutions, and government agencies.

12.     Westinghouse has purchased data storage products from DDN in the past.

13.     In or about January 2018, Westinghouse's software and systems technology team engaged in meetings and discussions with personnel from DDN regarding Westinghouse's needs and requirements related to replacement of the Dell Isilon data storage system.

14.     Through these discussions, DDN understood that one of the functions Westinghouse required was the simultaneous replication of live data to a secondary "disaster recovery" server for backup purposes. DDN further understood that this simultaneous replication of data was necessary to mitigate the risk of data loss in the event that the primary server failed.

15.     DDN represented and warranted to Westinghouse that the hardware and software it was offering for sale was able to perform these required functions.

16.     On February 1, 2018, Westinghouse purchased DDN's GRIDScaler File Storage Solution with SFA 14KX Block Storage (the "Primary Server"), and DDN's GRIDScaler File Storage Solution/DDN's GS7K Storage Appliance (the "Backup Server") (collectively, the "System"). (A copy of the Purchase Orders and Terms and Conditions for Purchase of Materials and Services (collectively, the "Purchase Agreement") are attached hereto as **Exhibit A**.)

17.     The total price for the System was $1,265,630.00 (the "Purchase Price").

18.     DDN delivered the Backup Server to Westinghouse in Cranberry Township on February 20, 2018.

19.     DDN delivered the Primary Server to Westinghouse in Monroeville on March 14, 2018.

20.     Prior to accepting the System, Westinghouse conducted "proof of concept" testing at its Cranberry Township headquarters and at its Monroeville Data Center to ensure that required features, including the data replication and disaster recovery capability, were functional.

21.     Westinghouse's original target date for acceptance and to place the System in operation was June 1, 2018.

22.     The first setback that Westinghouse encountered during testing was the discovery that the System could not simultaneously replicate data from the Dell Isilon system to the Primary Server (to populate with existing data), and then from the Primary Server to the Backup Server as a disaster recovery safeguard. This was in spite of the fact that DDN understood that this was a requirement and had represented and warranted that its System could perform such function.

23.     Next, on March 29, 2018, Westinghouse detected a malfunction in the System that resulted in a crash. This incident leading to a crash was followed by another crash on April 3, 2018. This occurred at a time when DDN was still preparing the Primary Server for testing, therefore Westinghouse was conducting initial testing on the Backup Server only. Specifically, Westinghouse was testing performance speeds, configuration / setup methods, and Network File System data mounts. The crashes related specifically to the Network File System data mounts.

4

24.     Westinghouse brought the issue to DDN's attention, and DDN performed a software upgrade that purportedly corrected the problem. When Westinghouse requested documentation demonstrating that the issue was resolved, however, DDN never provided this information. Thus, DDN never established that the issue causing the crashes was corrected.

25.     On May 11 and May 17, 2018, Westinghouse discovered a third problem. Specifically, while testing the data replication and disaster recovery functionality of the System, Westinghouse detected a separate series of ongoing crashes.

26.     Due to the persistence of these crashes, and resulting inability of the System to reliably replicate and backup Westinghouse's data, Westinghouse could not continue with meaningful testing, such as adding users to the environment, let alone place DDN's System into production due to the risk of crippling data loss in the event of a disaster situation.

27.     As with the March and April crashes, Westinghouse notified DDN and allowed the opportunity for DDN to correct the problem.

28.     Further, at all relevant times, Westinghouse fully cooperated with DDN in an effort to resolve the May crashes, including performing the installation of multiple software and hardware "upgrades" to the System at DDN's direction, providing all logs that were requested by DDN in a timely manner, and providing DDN's technical personnel with full access to the System as needed during both onsite and WebEx meetings and discussions.

29.     When it became apparent that DDN would be unable to meet Westinghouse's June 1, 2018 production deadline, Westinghouse was forced to extend its support agreement for the Dell Isilon system while DDN continued to attempt to remedy the crashes.

30.     By June 6, 2018, DDN was still unable to identify a solution for the crashes. Accordingly, Westinghouse informed DDN that if DDN was unable to resolve the problem by

July 1, 2018 Westinghouse would reject the System, which Westinghouse had never accepted, and would demand full compensation, including a complete refund of the Purchase Price.

31.     Despite being allowed additional time to resolve the problem, DDN failed to find a solution, nor was DDN ever able to offer Westinghouse reasonable assurances that the System would not fail if placed into production.

32.     Further, based upon DDN's inability to timely resolve the problem, Westinghouse feared that if additional issues with the System presented after it was placed in production, DDN would be unable to remedy these issues in a reasonable timeframe. This scenario could lead to paralysis of Westinghouse's business operations, and / or serious data loss.

33.     Without the ability to perform the data replication and disaster recovery functions, the System has no commercial value to Westinghouse.

34.     Accordingly, on July 6, 2018 Westinghouse communicated its rejection of the System to DDN, and demanded a full refund of the Purchase Price.

35.     To date, DDN has refused to refund all or even a portion of the Purchase Price. Instead, DDN has continued to propose unreasonable "solutions" to the problem. Moreover, DDN cannot provide assurances to Westinghouse that these proposed "solutions" will be successful.

**COUNT I**
**<u>BREACH OF CONTRACT</u>**

36.     Westinghouse hereby incorporates the above paragraphs as if fully set forth herein.

37.     The Purchase Agreement governs this dispute. (*See* **Exhibit A**.)

38.     Under Article 10 of the Purchase Agreement, DDN was obligated to deliver the System containing all of the features and functionality required by Westinghouse:

6

**Article 10 – Performance Standards; Seller's Warranties**

**10.1**   <u>Materials Warranty.</u>

(a)   Seller warrants that the Materials furnished by it under the Purchase Agreement (i) shall be free from defects in design, workmanship and materials; (ii) shall conform to and be of the kind and quality described in the Purchase Agreement and the plans and specifications; (iii) shall perform in the manner specified; and (iv) shall comply with all requirements of the Purchase Agreement.

(Purchase Agreement, Article 10.1 (a).)

39.     When Westinghouse identified the non-conformances in the System, DDN was obligated to either timely remedy the issue, or refund the Purchase Price:

(b)   All such Materials shall be warranted by Seller for 24 months from the date such Materials are placed in service by Westinghouse or four years after acceptance by Westinghouse, whichever first occurs.  Seller shall correct any nonconformance at its sole expense, as directed by Westinghouse, by promptly: (i) repairing or replacing the non-conforming Materials (and correcting any plans, specifications or drawings thereby affected) in a timely manner; (ii) furnishing Westinghouse any materials, parts and instructions necessary to enable Westinghouse or its customer to correct or have corrected the nonconformity, or (iii) refunding the purchase price, or an appropriate portion thereof, to Westinghouse.

(Purchase Agreement, Article 10.1 (b).)

40.     DDN failed to remedy the non-conformances in a commercially reasonable time and manner. Indeed, DDN has never resolved the non-conformances despite being given a reasonable opportunity to do so.

41.     Further, DDN has failed to refund the Purchase Price to Westinghouse even though the System has no commercial value to Westinghouse without the data replication and disaster recover functionality.

42.     Accordingly, DDN is in breach of the Purchase Agreement.

43.     As a result, Westinghouse is entitled to compensatory damages, including a refund of the Purchase Price of $1,265,630.00, plus interest. Westinghouse has also incurred consequential damages, including $44,258.00 for the purchase of additional storage nodes for the

Dell Isilon system, and $18,200.00 per month ($254,800.00 to date) for extended support of the Dell Isilon system.

WHEREFORE, Plaintiff Westinghouse Electric Company LLC respectfully requests an award in excess of the arbitration limits of Allegheny County, including a full refund of the Purchase Price, consequential damages, interest, attorney's fees, and such other relief as this Court deems just and appropriate.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**

44.     Westinghouse hereby incorporates the above paragraphs as if fully set forth herein.

45.     DDN expressly warranted that the System would be capable of performing the data replication and disaster recovery functions required by Westinghouse.

46.     The System is incapable of performing these functions, even in a testing environment, without encountering crashes.

47.     Westinghouse has paid DDN the full purchase price for the system but has been unable to place the System in operation due to the persistent crashes and resulting inability of the System to perform the required data replication and disaster recovery functions.

48.     DDN has beached its express warranty by failing to remedy these non-conformances despite being given a reasonable opportunity to do so.

49.     DDN has further breached its express warranty by failing to refund the Purchase Price to Westinghouse even though the System has no commercial value to Westinghouse without the data replication and disaster recover functionality.

50.     As a result, Westinghouse is entitled to compensatory damages, including a refund of the Purchase Price of $1,265,630.00, plus interest. Westinghouse has also incurred

consequential damages, including $44,258.00 for the purchase of additional storage nodes for the Dell Isilon system, and $18,200.00 per month ($254,800.00 to date) for extended support of the Dell Isilon system.

WHEREFORE, Plaintiff Westinghouse Electric Company LLC respectfully requests an award in excess of the arbitration limits of Allegheny County, including a full refund of the Purchase Price, consequential damages, interest, attorney's fees, and such other relief as this Court deems just and appropriate.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

51.     Westinghouse hereby incorporates the above paragraphs as if fully set forth herein.

52.     DDN holds itself out as an industry leader in "big data storage" and as a "supplier to data-intensive global organizations."

53.     Indeed, DDN has sold data storage products to Westinghouse in the past.

54.     Accordingly, DDN is a merchant with respect to data storage products and services.

55.     One intended purpose of a data storage solution, such as the System sold by DDN to Westinghouse in this case, is to safely and reliably maintain data.

56.     DDN's System, however, is unable to reliably replicate data from the Primary Server to the Backup Server. This is an essential function of the System. Without this function, DDN's System falls below commercial standards.

57.     This failure constitutes a breach of DDN's implied warranty of merchantability.

58.     As a result, Westinghouse is entitled to compensatory damages, including a refund of the Purchase Price of $1,265,630.00, plus interest. Westinghouse has also incurred

9

consequential damages, including $44,258.00 for the purchase of additional storage nodes for the Dell Isilon system, and $18,200.00 per month ($254,800.00 to date) for extended support of the Dell Isilon system.

WHEREFORE, Plaintiff Westinghouse Electric Company LLC respectfully requests an award in excess of the arbitration limits of Allegheny County, including a full refund of the Purchase Price, consequential damages, interest, attorney's fees, and such other relief as this Court deems just and appropriate.

**COUNT IV**
**BREACH OF IMPLIED WARRANTY OF**
<u>**FITNESS FOR A PARTICULAR PURPOSE**</u>

59.     Westinghouse hereby incorporates the above paragraphs as if fully set forth herein.

60.     Prior to Westinghouse's purchase of the System at issue from DDN, personnel from Westinghouse and DDN met and discussed the functionality that Westinghouse required.

61.     Specifically, Westinghouse informed DDN that the System would be required to simultaneously replicate live data to a secondary disaster recovery server for backup in the event that the Primary Server failed. DDN, as an experienced vendor, fully understood that this simultaneous replication of data was necessary to mitigate Westinghouse's risk of data loss.

62.     Accordingly, based on DDN's experience in the data storage industry, and the meetings and discussions between Westinghouse and DDN about the requirements for the specific System at issue, at the time Westinghouse and DDN entered into the Purchase Agreement for the purchase of the System, DDN was aware that Westinghouse needed a storage solution that could perform the data replication and disaster recovery functions.

63.     Similarly, DDN was also aware that Westinghouse was relying on the skill and/or judgment of DDN to select or furnish a storage solution that was capable of performing these essential functions.

64.     DDN subsequently failed to furnish Westinghouse with a System that was suitable for the specific purpose – reliable large-scale data storage with replication – required by Westinghouse. Without this function, DDN's System is not fit for Westinghouse's purposes.

65.     This failure is a breach of DDN's implied warranty of fitness for a particular purpose.

66.     As a result, Westinghouse is entitled to compensatory damages, including a refund of the Purchase Price of $1,265,630.00, plus interest. Westinghouse has also incurred consequential damages, including $44,258.00 for the purchase of additional storage nodes for the Dell Isilon system, and $18,200.00 per month ($254,800.00 to date) for extended support of the Dell Isilon system.

WHEREFORE, Plaintiff Westinghouse Electric Company LLC respectfully requests an award in excess of the arbitration limits of Allegheny County, including a full refund of the Purchase Price, consequential damages, interest, attorney's fees, and such other relief as this Court deems just and appropriate.

Respectfully submitted,

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

Date:   <u>October 7, 2019</u>                    By:  _____

Eric G. Soller
Pa. Id. No. 65560
Frank H. Stoy
Pa. Id. No. 314588

The Thirty-Eighth Floor
One Oxford Centre
Pittsburgh, PA  15219
412-263-2000

12

# EXHIBIT A

## ORDER NO. 9300273886

Issued on Thursday, February 1, 2018 EST
Created on Thursday, February 1, 2018 EST by Diane R. Yovanovich on behalf of Sachin R. Patel

| **SUPPLIER:** | **TOTAL AMOUNT** |
|---|---|
| DATADIRECT NETWORKS INC | $809,110.00 USD |

DATADIRECT NETWORKS INC
9351 DEERING AVE
CHATSWORTH, CA 91311-5858
United States
Phone: +1 1-800-837-2298
Fax: +1 9-1-818-700-7611
Contact: Michael Hoey

**DELIVERY PLANT:**
Westinghouse Electric Company LLC
4350 Northern Pike
Monroeville, PA 15146-2808
United States

**SEND INVOICE TO:**
Westinghouse Electric Co.
P.O.Box 3700
Pittsburgh, PA 15230
United States

**DELIVER TO:**
Sachin Patel

SOLD TO:
Company Name: Westinghouse Electric Company LLC
Company Address: 1000 Westinghouse Drive, Cranberry Township, PA, 16066-5228, US
Company Tax ID: 522140933

### LINE ITEM DETAILS (1 LINE ITEM )

| NO. | DESCRIPTION | PART NUMBER | QTY | NEED-BY DATE | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| 1 | **DDN GRIDScaler File Storage Solutions with ...** | | 1 lot | Thursday, February 1, 2018 EST | $809,110.00 USD | $809,110.00 USD |

Full Description: DDN GRIDScaler File Storage Solutions with SFA 14KX block storage

Req. Line No.: 1
OriginatingSystemLineNumber: 0
Requester: Sachin R. Patel
PR No.: PR308044
Product Due Date:

|  | **TOTAL AMOUNT** |
|---|---|
|  | $809,110.00 USD |

**COMMENTS**

- Diane R. Yovanovich, 01/31/2018:
  DDN Quote WESTINGHOUSE-GS14KX-MONROEVILLE, dated 1/24/2018 is attached. (Diane R. Yovanovich, Wednesday, January 31, 2018 EST)
- COMMENT by **Donna Miller** on *02/01/2018*
  The Incoterms Rule of this PO is FCA Origin; therefore Westinghouse will pay the freight bill.  However, Westinghouse requests that the Supplier set up the shipment with a Westinghouse approved carrier, using Westinghouse's account numbers so that the shipping charges automatically bill to Westinghouse.

  When the product is ready to ship to Westinghouse's site at Monroeville, PA please follow the appropriate instruction below based on the weight of the shipment:

  **0-150 lbs**

  For package shipments 0-150 lbs., Supplier is required to utilize UPS as the carrier.  Utilize the UPS Ground service level unless another service level is specified by Westinghouse.

  The UPS Account Number is 0000264787

  The Westinghouse Charge Number is EL704001 Place the Westinghouse Charge NumberEL704001 in UPS Reference Field 1 exactly as it is written and with no additional information in that field.

  If prompted by UPS to provide a billing zip code, use zip code 15146

  DO NOT declare any value, or request any additional insurance.  Westinghouse has its own cargo insurance policy.

  DO NOT use UPS if the package will be placed on a pallet.  All palletized shipments must be shipped via YRC.

  **151-10,000 lbs. (and less than 100" high and 90" wide)**

  For shipments 151-10,000 lbs. (and less than 100 inches high and 90 inches wide), Supplier is required to utilize YRC.

  The Westinghouse Charge Number is EL704001 Place the Westinghouse Charge Number on the Bill of Lading.  Indicate the billing as 3rd party collect to: Westinghouse Electric Co LLC c/o US Bank Transportation Solutions, PO Box 3001, Naperville, IL 60566. DO NOT declare any value, or request any additional insurance.  Westinghouse has its own cargo insurance policy.

  To set up an YRC shipment, the Supplier can contact their nearest YRC terminal.  To find the nearest YRC terminal, visit: https://my.yrc.com/dynamic/national/servlet?
  CONTROLLER=com.rdwy.ee.rexservicecenter.http.controller.ServiceCenterPublicController&DESTINATION=/rexservicecenter/serviceCenter.jsp&ERRORDESTINATION=/rexservicecenter/serviceCen

  YRC customer service can be reached at 1-800-610-6500.

  **Greater than 10,000 lbs., 100" high, or 90" wide**

  For shipments greater than 10,000 lbs., 100 inches high, or 90 inches wide, Supplier is required to contact Westinghouse Global Logistics Solutions at logistics@westinghouse.com

  Reference the PO number when contacting Westinghouse. (Donna Miller, Thursday, February 1, 2018 EST)
- COMMENT by **Donna Miller** on *02/01/2018*
  Invoices and all accounts payable inquiries are to be sent to AP department - wecvendors@westinghouse.com All invoices line items must reference the corresponding PO line item number. Invoices without this reference will not be paid.

  Each invoice shall list the item numbers, descriptions, quantities, and unit prices exactly as they appear in the applicable purchase order or purchase order change notice. Each shipment shall be billed on an individual invoice referencing the specific purchase order number. Single invoices covering more than one purchase order number and/or plant will not be accepted for processing.

  Unless otherwise noted in the text of the Purchase Order, all invoices shall only be submitted to Westinghouse after delivery or completion of invoiced items or services.

  Invoices not received as required above may be returned with an invoice rejection notice at the discretion of Westinghouse (Donna Miller, Thursday, February 1, 2018 EST)
- Donna Miller, 02/01/2018:
  Delivery Needed Thursday Feb 1, 2018 (Donna Miller, Thursday, February 1, 2018 EST)

**ATTACHMENTS**

**TERMS AND CONDITIONS OF PURCHASE**

This Purchase Order is governed by the Westinghouse Electric Company LLC Terms and Conditions for Purchase of Materials and Services (CTR-PO-2013-011 October 1, 2013) and collectively constitute a binding Purchase Agreement with Westinghouse Electric Company LLC.

To view the terms and conditions, please go to: https://supply.westinghousenuclear.com/SupplierDocs/Purchase%20Terms%20FINAL%2010-01-2013.pdf

Additionally, if this purchase order is related to Westinghouse's Hopkins/Columbia location, the following terms and conditions may apply: https://supply.westinghousenuclear.com/Main/Welcome.aspx

**ORDER NO. 9300273939**
Issued on Thursday, February 1, 2018 EST
Created on Thursday, February 1, 2018 EST by Diane R. Yovanovich on behalf of Sachin R. Patel

| SUPPLIER: | | | | | TOTAL AMOUNT |
|---|---|---|---|---|---|
| DATADIRECT NETWORKS INC | | | | | $456,520.00 USD |

DATADIRECT NETWORKS INC
9351 DEERING AVE
CHATSWORTH, CA 91311-5858
United States
Phone: +1 1-800-837-2298
Fax: +1 9-1-818-700-7611
Contact: Michael Hoey

**DELIVERY PLANT:**
Westinghouse Electric Co LLC
1000 Westinghouse Drive
Cranberry Township, PA 16066-5228
United States

**DELIVER TO:**
Sachin Patel

**SEND INVOICE TO:**
Westinghouse Electric Co.
P.O.Box 3700
Pittsburgh, PA 15230
United States

SOLD TO:
Company Name: Westinghouse Electric Company LLC
Company Address: 1000 Westinghouse Drive, Cranberry Township, PA, 16066-5228, US
Company Tax ID: 522140933

**LINE ITEM DETAILS** (1 LINE ITEM )

| NO. | DESCRIPTION | PART NUMBER | QTY | NEED-BY DATE | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| 1 | **DDN GRIDScaler File Storage Solutions ...** | | 1 lot | - | $456,520.00 USD | $456,520.00 USD |

Full Description: DDN GRIDScaler File Storage Solutions leveraging DDN's GS7K storage appliance

Req. Line No.: 1
OriginatingSystemLineNumber: 0
Requester: Sachin R. Patel
PR No.: PR308003
Product Due Date:

| | TOTAL AMOUNT |
|---|---|
| | $456,520.00 USD |

**COMMENTS**

- Diane R. Yovanovich, 01/31/2018:
  DDN 20171018-Westinghouse-Isilon Replacement, dated 1/24/2018 is attached. (Diane R. Yovanovich, Wednesday, January 31, 2018 EST)
- COMMENT by **Donna Miller** on *02/01/2018*
  The Incoterms Rule of this PO is FCA Origin; therefore Westinghouse will pay the freight bill. However, Westinghouse requests that the Supplier set up the shipment with a Westinghouse approved carrier, using Westinghouse's account numbers so that the shipping charges automatically bill to Westinghouse.

  When the product is ready to ship to Westinghouse's site at Cranberry Township, PA please follow the appropriate instruction below based on the weight of the shipment:

  **0-150 lbs**
  For package shipments 0-150 lbs., Supplier is required to utilize UPS as the carrier.  Utilize the UPS Ground service level unless another service level is specified by Westinghouse.

  The UPS Account Number is 00004175A5

  The Westinghouse Charge Number is EL704001 Place the Westinghouse Charge Number EL704001 in UPS Reference Field 1 exactly as it is written and with no additional information in that field.

  If prompted by UPS to provide a billing zip code, use zip code 16066

  DO NOT declare any value, or request any additional insurance.  Westinghouse has its own cargo insurance policy.

  DO NOT use UPS if the package will be placed on a pallet.  All palletized shipments must be shipped via YRC.

  **151-10,000 lbs. (and less than 100" high and 90" wide)**
  For shipments 151-10,000 lbs. (and less than 100 inches high and 90 inches wide), Supplier is required to utilize YRC.

  The YRC Account Number is 68247610983

  The Westinghouse Charge Number is EL704001 Place the Westinghouse Charge Number on the Bill of Lading.  Indicate the billing as 3rd party collect to: Westinghouse Electric Co LLC c/o US Bank Transportation Solutions, PO Box 3001, Naperville, IL 60566. DO NOT declare any value, or request any additional insurance.  Westinghouse has its own cargo insurance policy.

  To set up an YRC shipment, the Supplier can contact their nearest YRC terminal.  To find the nearest YRC terminal, visit: https://my.yrc.com/dynamic/national/servlet?CONTROLLER=com.rdwy.ec.rexservicecenter.http.controller.ServiceCenterPublicController&DESTINATION=/rexservicecenter/serviceCenter.jsp&ERRORDESTINATION=/rexservicecenter/serviceCen

  YRC customer service can be reached at 1-800-610-6500.

  **Greater than 10,000 lbs., 100" high, or 90" wide**
  For shipments greater than 10,000 lbs., 100 inches high, or 90 inches wide, Supplier is required to contact Westinghouse Global Logistics Solutions at logistics@westinghouse.com

  Reference the PO number when contacting Westinghouse.


  The Incoterms Rule of this PO is FCA Origin; therefore Westinghouse will pay the freight bill. However, Westinghouse requests that the Supplier set up the shipment with a Westinghouse approved carrier, using Westinghouse's account numbers so that the shipping charges automatically bill to Westinghouse.

  When the product is ready to ship to Westinghouse's site at Cranberry Township, PA please follow the appropriate instruction below based on the weight of the shipment:

  **0-150 lbs**
  For package shipments 0-150 lbs., Supplier is required to utilize UPS as the carrier.  Utilize the UPS Ground service level unless another service level is specified by Westinghouse.

  The UPS Account Number is 00004175A5

  The Westinghouse Charge Number is EL704001 Place the Westinghouse Charge Number EL704001 in UPS Reference Field 1 exactly as it is written and with no additional information in that field.

  If prompted by UPS to provide a billing zip code, use zip code 16066

  DO NOT declare any value, or request any additional insurance.  Westinghouse has its own cargo insurance policy.

  DO NOT use UPS if the package will be placed on a pallet.  All palletized shipments must be shipped via YRC.

  **151-10,000 lbs. (and less than 100" high and 90" wide)**
  For shipments 151-10,000 lbs. (and less than 100 inches high and 90 inches wide), Supplier is required to utilize YRC.

  The YRC Account Number is 68247610983

  The Westinghouse Charge Number is EL704001 Place the Westinghouse Charge Number on the Bill of Lading.  Indicate the billing as 3rd party collect to: Westinghouse Electric Co LLC c/o US Bank Transportation Solutions, PO Box 3001, Naperville, IL 60566. DO NOT declare any value, or request any additional insurance.  Westinghouse has its own cargo insurance policy.

  To set up an YRC shipment, the Supplier can contact their nearest YRC terminal.  To find the nearest YRC terminal, visit: https://my.yrc.com/dynamic/national/servlet?CONTROLLER=com.rdwy.ec.rexservicecenter.http.controller.ServiceCenterPublicController&DESTINATION=/rexservicecenter/serviceCenter.jsp&ERRORDESTINATION=/rexservicecenter/serviceCen

  YRC customer service can be reached at 1-800-610-6500.

  **Greater than 10,000 lbs., 100" high, or 90" wide**
  For shipments greater than 10,000 lbs., 100 inches high, or 90 inches wide, Supplier is required to contact Westinghouse Global Logistics Solutions at logistics@westinghouse.com

  Reference the PO number when contacting Westinghouse. (Donna Miller, Thursday, February 1, 2018 EST)
- COMMENT by **Donna Miller** on *02/01/2018*
  Invoices shall be sent directly to:
  The invoice and all accounts payable inquiries are to be sent to AP department - wecvendors@westinghouse.com All invoices line items must reference the corresponding PO line item number. Invoices without this reference will not be paid.

  Each invoice shall list the item numbers, descriptions, quantities, and unit prices exactly as they appear in the applicable purchase order or purchase order change notice. Each shipment shall be billed on an individual invoice referencing the specific purchase order number. Single invoices covering more than one purchase order number and/or plant will not be accepted for processing.

  Unless otherwise noted in the text of the Purchase Order, all invoices shall only be submitted to Westinghouse after delivery or completion of invoiced items or services.

  Invoices not received as required above may be returned with an invoice rejection notice at the discretion of Westinghouse (Donna Miller, Thursday, February 1, 2018 EST)
- Donna Miller, 02/01/2018:
  Delivery Needed Thursday Feb 1, 2018 (Donna Miller, Thursday, February 1, 2018 EST)

**ATTACHMENTS**

**TERMS AND CONDITIONS OF PURCHASE**

This Purchase Order is governed by the Westinghouse Electric Company LLC Terms and Conditions for Purchase of Materials and Services (CTR-PO-2013-011 October 1, 2013) and collectively constitute a binding Purchase Agreement with Westinghouse Electric Company LLC.

To view the terms and conditions, please go to: https://supply.westinghousenuclear.com/SupplierDocs/Purchase%20Terms%20FINAL%2010-01-2013.pdf

Additionally, if this purchase order is related to Westinghouse's Hopkins/Columbia location, the following terms and conditions may apply: https://supply.westinghousenuclear.com/Main/Welcome.aspx

CTR-PO-2013-011 Rev4 (Feb2017)

**WESTINGHOUSE ELECTRIC COMPANY LLC**
**TERMS AND CONDITIONS**
**FOR**
**PURCHASE OF MATERIALS AND SERVICES**

### Article 1 – Acceptance and Authority

**1.1**      The purchase order ("Purchase Order") together with these Terms and Conditions, which are [hyperlinked from the Purchase Order or otherwise] provided to Seller, collectively constitute a binding agreement (the "Purchase Agreement") between Westinghouse Electric Company LLC acting through its supply chain management organization ("Westinghouse") and Seller (as shown on the face of the Purchase Order) and applies to all purchases by Westinghouse from Seller of Materials and Services (as each is defined below).

**1.2**      In the event of any conflict between the Purchase Agreement and any other document or instrument submitted by Seller, the Purchase Agreement will govern.  Seller must reject Purchase Orders within three Days of receipt or the Purchase Agreement will be deemed accepted by Seller.

**1.3      Westinghouse expressly limits acceptance of the Purchase Agreement to the terms stated herein.**  Any additional, different, or inconsistent terms or conditions contained in any form, acknowledgment, acceptance, or confirmation used by Seller in connection with the implementation of the Purchase Order are hereby objected to and rejected by Westinghouse.

**1.4**      If for any reason the Purchase Agreement is construed as an acceptance of Seller's offer, such acceptance is expressly conditioned on Seller's assent to any different, conflicting or additional terms, express or implied, in the Purchase Agreement.

### Article 2 – Definitions

For purposes of the Purchase Agreement, the following defined terms have the meanings given below, except where the context clearly indicates a different meaning is intended.  These definitions may be supplemented by any definitions contained elsewhere in these Terms and Conditions or in any of the documents incorporated by reference in the Purchase Agreement, but in case of any conflict or inconsistencies, the definitions set forth below will prevail.

"Certified Diverse Business Enterprise" means any business classified as a certified business by a third party such as the National Minority Supplier Development Council, Women's Business Enterprise National Council, Small Business Administration, Veterans Administration or other State certification agency with comparable standards.

"Change Notice" means the written document issued by Westinghouse to Seller to make changes to, additions to and/or deletions from the Work.

"Day" means a calendar day and includes Saturdays, Sundays and legal holidays.

"Disclosing Party" means the Party disclosing Proprietary Information to the other Party.

"Diverse Supplier(s)" means any of the following: Small Business Enterprise, Disadvantaged Business Enterprise, Woman Business Enterprise, 8(a) Business Development, Services Disabled-Veteran Owned

© 2016 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

Business Enterprise and Veteran Owned Business Enterprise, and Historically Underutilized Business Zone.

"Documentation" means all information, data, drawings, studies, reports, evaluations, designs, records, forms, manuals, reviews, procedures, specifications, plans, and all other documentation, including all required labor, transportation, packaging, storage, design, drawing, creating, engineering, procurement, and licenses to intellectual property therefore, that are produced or acquired by Seller for or at the direction of Westinghouse and specified as deliverables (required submittals) in the Purchase Order.

"Effective Date" shall mean the effective date identified on the signature page of the Purchase Order.

"Lien" means a lien, mortgage, pledge, encumbrance, charge, security interest, option, right of first refusal, other defect in title or other restriction of any kind or nature.

"Materials" means the machinery, goods, materials, components, equipment, computer hardware and its associated software and firmware, apparatus, components, incidentals or other items of any kind that are described in the Purchase Agreement, including all required labor, manufacturing, transportation, packaging, storage, design, drawing, creating, engineering, procurement, and licenses to intellectual property therefor.

"NRC" means the U.S. Nuclear Regulatory Commission and its staff.

"Party" and "Parties" means Westinghouse and Seller referred to individually and collectively, as the case may be.

"Proprietary Information" means the terms of the Purchase Agreement and any and all information, data, software, matter or thing of a secret, proprietary, confidential or private nature identified as confidential and/or proprietary information or the like by the Disclosing Party, relating to the business of the Disclosing Party, including matters of a technical nature (such as know-how, processes, data and techniques), matters of a business nature (such as information about schedules, costs, profits, markets, sales, customers, the Parties' contractual dealings with each other and the Work that is the subject-matter thereof), matters of a proprietary nature (such as information about patents, patent applications, copyrights, trade secrets and trademarks), other information of a similar nature, and any other information which has been derived from the foregoing information by the Receiving Party.

"Purchase Price" means the compensation to be paid by Westinghouse to Seller for Seller's performance of the Work as specified in the Purchase Order and as may be modified from time to time by the issuance of a Change Notice.

"Quality Assurance Program" means a written program covering, as applicable to the Work, the design, procurement, manufacturing, erection, testing and inspection of the Work, consistent with its nuclear safety or quality classification, and meeting the requirements of Article 18 – Audit Rights and Quality Assurance.

"Receiving Party" means the Party receiving Proprietary Information from the other Party.

"Services" means all services that are performed by Seller as described in the scope of Work, including, as applicable, technical support for installation, maintenance, repair, commissioning and testing of the Materials, training, consulting, and any other services necessary to fulfill Seller's services obligations under the scope of Work.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

"Subcontractor" means one of Seller's subcontractors or suppliers of any tier performing or providing a portion of the Work under any contract, purchase order or other writing between Seller and any Subcontractor of any tier, pursuant to which the Subcontractor performs or provides a portion of the Work.

"Third Party" or "Third Parties" means a party or parties other than Westinghouse and Seller.

"Work" means all work, including Materials, Services and Documentation supplied by Seller under the Purchase Agreement.

### Article 3 – Authority and Communication

**3.1**   Seller acknowledges that only a representative of the supply chain management organization of Westinghouse Electric Company LLC is authorized to enter into the Purchase Agreement on behalf of Westinghouse.

**3.2**   All written communications must be directed to Westinghouse's supply chain management representative.  Seller is permitted to communicate with Westinghouse's Engineering or Quality Assurance personnel on technical or quality matters only.  Any agreements resulting from such communications shall be binding on Westinghouse and Seller only if documented by Westinghouse's Change Notice.

### Article 4 – Subcontracting and Federal Employment Requirements

**4.1**      Seller shall not subcontract any portion of the Work without prior written approval of Westinghouse.

**4.2**      Seller shall comply, to the extent applicable, with Executive Order 11246, Section 503 of the Rehabilitation Act of 1973, as amended, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, and the implementing regulations for each found at 41 C.F.R. Part 60.  The Parties incorporate into the Purchase Agreement, as applicable, the Equal Opportunity clauses found at 41 C.F.R. § 60-1.4(a), 60-250.5(a), 60-741.5(a), and 60-300.5(a), and Seller shall likewise incorporate the clauses into all applicable contracts with Subcontractors as required by 41 C.F.R. § 60-1.4(c), and Seller shall likewise incorporate the clauses into all applicable contracts with Subcontractors as required by 41 C.F.R. § 60-1.4(c).

**4.3**      It is the policy of Westinghouse that Certified Diverse Business Enterprises have equal opportunity to compete in sourcing opportunities and to set utilization goals to optimize the use of certified diverse businesses.

Seller is strongly encouraged to provide certified diverse businesses with the maximum practical opportunity to participate as Subcontractors and to award such subcontracts to the fullest extent consistent with efficient contract performance.  Seller shall submit quarterly reports to Westinghouse identifying all purchases made with Diverse Suppliers.  Seller shall comply, to the extent applicable, with 48 C.F.R. 52.219-9, Small Business Subcontracting Plan.

**4.4**      Seller incorporates into the Purchase Agreement, as applicable, the obligations regarding the notice of employee rights under U.S. Federal labor laws found at 29 C.F.R. Part 471, Appendix A to

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

Subpart A, and will likewise incorporate those obligations into all applicable contracts with Subcontractors as required by 29 C.F.R. Part 471.

**Article 5 – Testing and Inspection of Work (Inspection and Acceptance of Work)**

**5.1**   All Work in progress (including Work performed by Subcontractors) shall be subject to inspections and tests as Westinghouse may direct and may be performed by Westinghouse, Westinghouse's customer or representatives of either.  If inspections and tests are made on Seller's (or Subcontractors) premises, Seller shall furnish, at no additional charge, facilities and assistance for safe and convenient inspections and tests.  Seller shall provide Westinghouse and Westinghouse's customer or their representatives with access to plant, facilities and records of Seller and its Subcontractors for inspection. Seller shall promptly correct all nonconforming Work at its sole expense.

**5.2**     No inspection or observance of any inspection or testing performed or failed to be performed by Westinghouse under the Purchase Agreement shall be deemed to constitute a waiver of any of Seller's obligations under the Purchase Agreement or be construed as an approval or acceptance of the Work.

**Article 6 – Payment**

**6.1**     Westinghouse shall pay an undisputed invoice within forty-five (45) Days of receipt of such invoice by Westinghouse.  Payment of any invoice shall not constitute approval or acceptance of any Work; shall not be evidence of satisfactory performance of the Work in whole or in part; shall not be construed to be acceptance of defective or nonconforming Work; and shall not relieve Seller of any of its obligations under the Purchase Agreement.  Westinghouse has the right to withhold all or any portion of any payment to Seller to the extent as may be necessary to protect Westinghouse from loss due to Seller's failure to fulfill any obligations under the Purchase Agreement.

**6.2**     If any invoice or part thereof is deficient or disputed in any material respect, Seller will be required by Westinghouse to resubmit that invoice in proper form.  Westinghouse shall notify Seller of the deficient or disputed invoice within thirty (30) Days after receipt of such invoice along with evidence which reasonably documents the contractual basis of the deficiency or dispute.  Westinghouse shall pay any portion of the original invoice that is not in dispute within forty-five (45) Days after the date of Westinghouse's receipt of Seller's new invoice in proper form for such undisputed amount.  When the disputed invoice, or part thereof, is resolved, Seller shall submit a new invoice; and Westinghouse shall pay any amount due or Seller shall refund any amount by which it was overpaid, as applicable, within forty-five (45) Days after the date of Westinghouse's receipt of Seller's new invoice in proper form.

**6.3**     Westinghouse may set off any sums due and payable by Seller to Westinghouse under the Purchase Agreement against any payments due to Seller.

**6.4**     Seller shall reference the Purchase Order by number on any invoice issued to Westinghouse.

**Article 7 – Taxes**

The Purchase Price shall not include sales or use taxes imposed upon the sale or use of tangible personal property or services contemplated by the Purchase Agreement, and such taxes, if applicable, are for Westinghouse's account.  If Seller is registered to collect applicable sales or use taxes, it shall do so as an addition to the Purchase Price, unless Westinghouse furnishes an exemption certificate.  All other taxes

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

imposed prior to delivery at the destination point are for the account of Seller, including property taxes imposed with respect to Materials for which title has passed to Westinghouse pursuant to the Purchase Agreement, including but not limited to, inventory taxes that may be levied while such Materials are being stored by Seller or is otherwise in Seller's custody.

## Article 8 – Changes

**8.1**     The Purchase Agreement may not be changed, amended, waived or modified except upon the prior written authorization of Westinghouse, acting pursuant to Article 3 above.

**8.2**     Westinghouse may make changes in the Work by written Change Notice, and Seller shall promptly comply with such Change Notice.  If the change materially affects Seller's cost or time for performance, the terms of the Purchase Agreement will be equitably adjusted in writing.  Seller must assert any claim for adjustment as promptly as possible, but in no event more than 30 Days after receipt of any such Change Notice.  Seller shall, at Westinghouse's direction, proceed with the change(s) pending resolution of any dispute and Seller's failure to proceed as directed shall be deemed to be a material breach of the Purchase Agreement.

## Article 9 – Schedule Requirements

The Parties agree that the performance and delivery schedules, both general and detailed, attached to or referenced in the Purchase Order are incorporated in the Purchase Agreement as an integral part of the Purchase Agreement and, but for Seller's agreeing to meet the performance and delivery schedule set forth in the Purchase Agreement, Westinghouse would not have entered into the Purchase Agreement.  Any change in the schedule shall only be made by a Change Notice as set forth in Article 8 and a signed written agreement executed by an authorized representative of both Parties.

## Article 10 – Performance Standards; Seller's Warranties

**10.1**     <u>Materials Warranty</u>.

**(a)**     Seller warrants that the Materials furnished by it under the Purchase Agreement (i) shall be free from defects in design, workmanship and materials; (ii) shall conform to and be of the kind and quality described in the Purchase Agreement and the plans and specifications; (iii) shall perform in the manner specified; and (iv) shall comply with all requirements of the Purchase Agreement.

**(b)**     All such Materials shall be warranted by Seller for 24 months from the date such Materials are placed in service by Westinghouse or four years after acceptance by Westinghouse, whichever first occurs.  Seller shall correct any nonconformance at its sole expense, as directed by Westinghouse, by promptly: (i) repairing or replacing the non-conforming Materials (and correcting any plans, specifications or drawings thereby affected) in a timely manner; (ii) furnishing Westinghouse any materials, parts and instructions necessary to enable Westinghouse or its customer to correct or have corrected the nonconformity, or (iii) refunding the purchase price, or an appropriate portion thereof, to Westinghouse.

**(c)**     The warranty, with respect to any corrected Materials, shall be extended to one year from the date of repair or replacement or as stated in paragraphs (a) and (b) above, whichever is later.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

**10.2**    <u>Services Warranty</u>.

**(a)**    Seller warrants that Services furnished by it under the Purchase Agreement (i) shall reflect the highest standards of professional knowledge and judgment, (ii) shall be free from defects in workmanship, and (iii) shall be in compliance with all requirements of the Purchase Agreement, until 24 months from the completion of such Services.

**(b)**    Seller shall correct any nonconformity with this warranty at its sole expense, as directed by Westinghouse, by promptly: (i) re-performing the non-conforming Services, or (ii) refunding the Purchase Price or appropriate portion thereof to Westinghouse.

**(c)**    The warranty, with respect to any corrected Services, shall be extended to one year from the date of re-performance of Services or as stated in paragraphs (a) and (b) above, whichever is later.

**10.3**    <u>Compliance Warranty</u>.

**(a)**    Seller warrants that:

**(i)**    Seller has and will maintain any permits, licenses, registrations or other governmental approvals, including required export licenses or other approvals to meet the specified delivery obligations herein, which may be required for its performance under the Purchase Agreement.  Seller shall comply with all such permits and with all applicable executive orders and federal, state, municipal and local laws of the location in which the Materials will be produced or Services performed as well as all rules, orders, requirements and regulations thereunder;

**(ii)**    Seller shall comply with all applicable laws, codes and standards; and

**(iii)**    while upon the premises of Westinghouse or Westinghouse's customer, Seller shall comply with all applicable site rules and policies;

**(b)**    Seller shall correct any nonconformity with this warranty at its sole expense, as directed by Westinghouse.

**10.4**    <u>Warranty Beneficiaries</u>.

The foregoing warranties shall extend to, and be for the benefit of Westinghouse and Westinghouse's customers.

## Article 11 – Indemnity

Seller shall defend, indemnify and hold harmless Westinghouse and its officers, agents, employees, successors and assigns from and against any and all liabilities, damages, costs, losses, claims, demands, actions, and expenses (including reasonable attorney fees) arising out of, resulting from, or relating to the Purchase Agreement or the Work or performance of the Work, including but not limited to loss of use resulting therefrom, acts or omissions in violation of applicable laws, claims or fines by governmental authorities, and resulting from the death of or injury to any person or damage to any property, except to the extent caused by the negligence or willful misconduct of Westinghouse.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

**Article 12 – Insurance**

**12.1**   <u>Seller's Insurance Requirements</u>.  Seller shall, during the performance of the Work, maintain insurance of the types and minimum amounts set forth below.  Seller shall ensure that all such insurance is maintained in full force and effect as specified herein from its commencement of performance of the Work to the date of expiration of the Warranty Period hereunder.

| <u>Type of Coverage</u> | <u>Minimum Amount of Coverage</u> |
| --- | --- |
| Workers' Compensation or equivalent complying with the applicable Laws for Seller's territory | As required by Law (statutory limit) |
| Employer's Liability | $1,000,000 each accident for bodily injury and $1,000,000 each employee for bodily injury by disease. |
| Commercial General Liability (CGL) insurance written on ISO Occurrence form CG 00 01 (or a substitute form with equivalent coverage), providing cover for premises, operations, products-completed operations, personal and advertising injury, and liability assumed under an insured contract | Not less than $5,000,000 each occurrence, $5,000,000 General Aggregate and $5,000,000 Products Completed Operations Aggregate |
| Automobile Liability, including owned, hired, and non-owned automotive equipment used in connection with the insured operation | Bodily Injury and Property Damage Combined - $2,000,000 each occurrence |
| Umbrella or Excess Liability Insurance following the form of the primary liability policies for the coverage required above.  The Umbrella limits can also be used to satisfy the limit requirements of the above policies | Not less than $5,000,000 each occurrence; $10,000,000 in Liability limits is required in total when in combination with primary policies |
| Professional Liability including coverage for professional negligent acts, errors or omissions. | $10,000,000 each accident and in the aggregate per year |
| Open Cargo Insurance must be obtained on Materials to be transported. | In the amount of the value of the Materials, Delivery, FCA (domestic shipments) or DAP (international shipments) Incoterms 2010 unless specified otherwise in the P.O.) +10% |
| Inland Transit Insurance must be obtained on Materials to be transported. | In the amount of the reinstatement value of the Materials in transit. |
| Property | In the amount of the reinstatement value of the materials in Seller's (or manufacturer's) custody or control. |

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

**12.2**   <u>Provisions Applicable to All Coverages</u>.

**(a)**   All insurance required to be provided by Seller hereunder shall be placed with insurers having an A.M. Best and Company rating level of A- or better, Class VII or better and authorized to do business in the state or states where the Work is to be performed.

**(b)**   Maintenance of insurance shall not limit Seller's liability for loss or damage in excess of policy limits or outside of policy coverage.

**(c)**   Within 30 Days after the Effective Date, Seller shall furnish Westinghouse one or more certificates of insurance for all liability insurance policies required to be provided under the Purchase Agreement.  The certificates shall list all required endorsements as set forth in Section 12.3 below.  Such certificates shall provide that the insurer on each policy shall endeavor to give 30 Days' written notice to Westinghouse prior to any material change or cancellation of the insurance.  Seller shall deliver to Westinghouse a certificate of insurance with respect to each renewal policy within 30 Days of the renewal date.  Each certificate furnished pursuant to this Section 12.2(c) shall state that it is being furnished in compliance with the requirements of the Purchase Agreement and shall identify the Purchase Order by the number assigned to it by Westinghouse, unless otherwise approved in writing by Westinghouse.

**(d)**   Neither a failure of Seller to provide the required certificate of insurance nor Seller's submission of a certificate of insurance not in conformance with the insurance requirements stated in this Article 12 relieves Seller from the obligation to have in force the required insurance coverages and endorsements to the policies as set forth below.

**(e)**   Seller is responsible for any deductibles associated with its policies of insurance.

**(f)**   Any limits of coverage may be met by one or more layers of coverage.

**12.3**   <u>Policy Endorsements</u>.

**(a)**   Each liability insurance policy (including the Workers' Compensation and Employer's Liability policies) required to be provided by Seller in Section 12.1 above shall contain or be endorsed to contain the following provision:

The insurer waives any right of subrogation against Westinghouse Electric Company LLC and its members, officers, directors, employees, lenders, subcontractors and suppliers of any tier.

**(b)**   Each policy (except the Workers' Compensation, Employer's Liability, Property, Professional Liability, Open Cargo and/or Inland Transit Insurance policies) required to be provided by Seller in Section 12.1 above shall also contain or be endorsed to contain the following provisions:

**(i)**   Westinghouse Electric Company LLC and its members, officers, directors, employees, lenders, subcontractors and suppliers of any tier are covered as additional insureds to the extent of Seller's indemnity obligations under the Purchase Agreement.

**(ii)**   All provisions of this policy, except the limits of liability, will operate in the same manner as if there were a separate policy covering each insured under each policy.

**(iii)**   The insurer waives any and all right of recourse under this policy against the additional insureds for the payment of premiums, additional premiums or assessments.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

**(iv)** This policy shall be primary, or excess only with respect to the specified primary policy provided by the named insured(s) for such coverage, and not excess or contributing with respect to any other insurance maintained by or for the additional insureds.

## 12.4 Westinghouse Liability

In no event shall Westinghouse's aggregate liability to Seller for any loss or damage arising out of or in connection with or resulting from the Purchase Agreement exceed the price allocable to the Work or unit thereof which gives rise to the claim.  Westinghouse shall not be liable for interest charges or penalties of any description.

## Article 13 – Liens

**13.1** Seller warrants that the Materials and Services will be free and clear of all liens, claims and encumbrances at the time of delivery and completion of the Work, and upon Westinghouse's request, Seller shall promptly provide releases and lien waivers in a form satisfactory to Westinghouse as a condition to receiving payment from Westinghouse.  Seller shall not file, nor shall Seller permit any Subcontractor or any other person furnishing labor or materials to Seller or to any Subcontractor for the performance of the Work to file, any mechanic's lien or other encumbrance of any type against Westinghouse's or Westinghouse's customer's buildings, structures or land for any Work or any part thereof.  Seller agrees to provide the Work lien free and shall hold the property owner harmless from any lien claim by discharging such claim by cash bond or surety bond.

**13.2** In the event that any Subcontractor files or causes to be filed a mechanics' lien claim or other encumbrance of any type, Seller shall immediately take any and all steps to post cash, securities or a bond in substitution of the mechanics' lien claim.  Furthermore, in the event that any Subcontractor files or causes to be filed a mechanics' lien claim or encumbrance , Seller shall protect, defend, hold harmless and indemnify the property owner from and against any and all claims, demands, actions, liabilities, liens, damages, losses, costs and expenses resulting from or in any manner arising out of or in connection with any liens, encumbrances or mechanics' liens noticed, claimed, filed, asserted or otherwise brought against the owner of the property by any person or entity providing labor and/or materials to Westinghouse or any subcontractor.

## Article 14 – Proprietary (Confidential) Information

**14.1** Previous Agreements Superseded.  The terms of this Article 14 will prevail in the event of conflict with any previous proprietary or confidentiality agreement executed by Westinghouse and Seller for the purposes described in Section 14.2 below.

**14.2** Purpose of Use.  Proprietary Information shall be used by the Receiving Party exclusively in connection with the performance of its responsibilities relating to (a) the Work and (b) the Purchase Agreement.

**14.3** Prevention of Unauthorized Disclosure.  The Receiving Party shall employ all reasonable commercial efforts and precautions to maintain the Proprietary Information received under the Purchase Agreement in strict confidence and to prevent loss or unauthorized disclosure of the Proprietary Information.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

**14.4**   <u>Disclosure to Third Parties</u>.  Westinghouse shall have the right to disclose Proprietary Information to Westinghouse's customer and to Westinghouse's parent and subsidiary companies and companies under common control.  Otherwise, a Receiving Party shall disclose the Proprietary Information only to its employees who (a) have a need to know solely for the purposes set forth in Section 14.2 above and (b) have agreed to comply with the terms of this Article 14.  A Receiving Party shall not disclose Proprietary Information to any other person, firm or company without the prior written approval of the Disclosing Party.

**14.5**   <u>Disclosure Required by Law or Order</u>.  If the Receiving Party becomes legally compelled (by oral questions, interrogatories, request for information or documents, subpoena, civil investigative demand or similar process) to disclose any Proprietary Information, the Receiving Party shall provide the Disclosing Party with prompt written notice so it may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Article 14.  If such protective order or other remedy is not obtained, or compliance with the provisions of this Article 14 is waived, the Receiving Party shall disclose only the minimum amount of Proprietary Information that is legally required and shall exercise reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the Proprietary Information so disclosed.

**14.6**   <u>Exceptions</u>.  The requirements of Sections 14.3, 14.4, and 14.5 will not apply to any Proprietary Information that is:

**(a)**      at the time of disclosure generally known or readily available to the trade or public or becomes so known or readily available without fault of the Receiving Party;

**(b)**      lawfully obtained at any time from a Third Party legally entitled to possess the information and provide it to the Receiving Party, if the use or disclosure (as appropriate) is in accordance with the rights or permission lawfully granted to the Receiving Party by such Third Party;

**(c)**      disclosed in any issued patent, publication, or other source from and after the time it becomes generally available to the public; or

**(d)**      independently developed by the Receiving Party without the benefit of the Proprietary Information disclosed to the Receiving Party under the Purchase Agreement.

**Article 15 – Ownership of Intellectual Property**

**15.1**   <u>Westinghouse Background Information.</u>

**(a)**      "Westinghouse Background Information" means all of Westinghouse's data, designs, drawings, technical specifications and other information furnished to Seller for purposes of the Work and the Purchase Agreement.

**(b)**      All Westinghouse Background Information, including but not limited to all intellectual property rights associated therewith, including its work processes, shall remain the complete and exclusive property of Westinghouse.

**(c)**      Westinghouse hereby grants Seller a license on a non-exclusive and royalty-free basis to use and modify the Westinghouse Background Information solely for the purpose of providing the Work to Westinghouse.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

**(d)**      Westinghouse shall own all right, title and interest in any and all modifications made by Seller to Westinghouse Background Information.

**15.2**   Seller Background Information.

**(a)**      "Seller Background Information" means all of Seller's data, designs, drawings, technical specifications and other information developed or obtained by Seller outside the scope of the Purchase Agreement (excluding all information provided either by or on behalf of Westinghouse pursuant to any other agreement with Westinghouse) and used by Seller to develop the Foreground Information.

**(b)**      All Seller Background Information, including but not limited to all intellectual property rights associated with it, including its work processes, shall remain the complete and exclusive property of Seller.  Seller shall retain all right, title and interest in and to Seller Background Information, including all intellectual property rights therein.

**(c)**      Seller hereby grants Westinghouse a license on an irrevocable, perpetual, non-exclusive, assignable, paid-up, royalty-free and worldwide basis to use, have used, copy, modify, have modified, create derivative works of, store electronically and sublicense Seller Background Information for purposes of licensing, maintaining, operating, repairing, and modifying the Work, demonstrating compliance with codes and standards, and other similar purposes as may be required by Westinghouse.

**(d)**      At Westinghouse's reasonable request, Seller shall provide Westinghouse with remote electronic access to Seller Background Information unless precluded by third-party license restrictions.

**15.3**   Foreground Information.

**(a)**      "Foreground Information" means all information, data, documents, drawings, software, designs, specifications or innovations generated, developed or obtained by Seller under the Purchase Agreement and incorporated in the Work.

**(b)**      Westinghouse shall own all right, title and interest in all Foreground Information, including all associated intellectual property rights therefor (including copyright).

**(c)**      For the term of the Purchase Agreement only, Westinghouse hereby grants Seller a license on a non-exclusive, royalty-free basis to use the Foreground Information for performance of the Work for the benefit of Westinghouse.

**(d)**      Seller shall provide Westinghouse with the necessary assistance (and direct its employees to do the same) for Westinghouse to file and prosecute patent applications in order to protect Foreground Information, including by making any assignments of ownership that may be required by Westinghouse.

**15.4**   Third-Party Information.

**(a)**      "Third-Party Information" means any information and intellectual property provided by unaffiliated third parties that is used by Seller in the performance of and incorporated into the Work.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

    **(b)**    To the extent such Third-Party Information is included in any Work, Seller shall obtain for Westinghouse and its suppliers, subcontractors, and customers, to the extent reasonably possible, the right to use, have used, copy, modify, have modified such Third-Party Information as required for the design, construction, operation, maintenance and licensing of the Work.

    **(c)**    Seller represents that it holds a license to such Third-Party Information and it is authorized under such license to sublicense the Third-Party Information as required herein.

**15.5**    <u>Documentation.</u>

    **(a)**    Subject to Section 15.2 above, Westinghouse shall own all right, title and interest in and to all Documentation, including all intellectual property rights associated with the contents of the Documentation, in whatever medium the Documentation may be provided.

    **(b)**    Seller shall provide Westinghouse with the necessary assistance (and direct its employees to do the same) for Westinghouse to file and prosecute patent applications or otherwise to assert, establish and protect its intellectual property rights in the Documentation, including by making any assignments of ownership that may be required by Westinghouse at no out-of-pocket expense to Seller.

    **(c)**    For Documentation containing no Seller Background Information or Third-Party Information, Seller shall clearly mark such Documentation with the notation "Westinghouse Proprietary Class 2" unless otherwise directed by Westinghouse.

    **(d)**    For Documentation that contains Seller Background Information and/or Third-Party Information, Seller shall clearly mark and identify such Seller Background Information and/or Third-Party Information, if possible, and shall mark such Documentation with a notation that states, "This document contains [Seller's] proprietary information and [Westinghouse's] proprietary information, and it shall be treated in accordance with the agreement under which it was provided."

    **(e)**    For Documentation that is manifested or transmitted electronically, such marking(s) shall first appear on the computer screen when accessing the file in which it is recorded.

    **(f)**    Documentation submitted without any markings as required above shall be deemed to contain no Seller Background Information or Third-Party Information and to contain entirely Westinghouse Background Information and/or Foreground Information.  Westinghouse shall have the right to mark such Documentation accordingly.

**Article 16 – Title; Risk of Loss; Delivery**

**16.1**    <u>Transfer of Title</u>.  Title to an item of Materials furnished under the Purchase Agreement as all or part of the Work shall pass to Westinghouse upon the earlier of (a) payment in full by Westinghouse to Seller for such item; or (b) delivery of such item to Westinghouse.  While Seller has any Materials in its possession that are owned by Westinghouse or in which Westinghouse holds in an interest in any way, whether secured or unsecured, Seller shall clearly identify and segregate such Materials unless this requirement is waived in writing by Westinghouse.  In the event payments are made by Westinghouse

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

prior to delivery, Seller hereby grants a security interest in such Materials and related Documentation to the extent of Westinghouse's advance and Seller shall execute and deliver such documents as may be deemed necessary by Westinghouse to protect its rights in and to the Materials and related Documentation.  The passage of title to Westinghouse shall not be deemed an acceptance or approval of any Work, shall not affect the allocation of risk of loss, and shall not otherwise relieve Seller of any obligations, including obligations related to delivery, under the Purchase Agreement.

**16.2**    <u>Risk of Loss</u>.  Regardless of whether title has passed to Westinghouse, the risk of loss for the Work remains with Seller until delivery of the Work to Westinghouse in accordance with this Article 16.  Seller shall at its cost promptly replace, repair or reconstruct any Work that is lost, damaged, or destroyed while Seller bears the risk of loss.

**16.3**    <u>Delivery</u>.  Unless otherwise specified in the Purchase Order, deliveries within the United States shall be FCA at the place of delivery designated in the Purchase Order (Incoterms®2010), and international delivery shall be DAP at the place of delivery designated in the Purchase Order (Incoterms®2010).

**16.4** The provisions of this Section 16.4 shall apply for delivery to Westinghouse in the United States.  Seller shall provide in writing to Westinghouse at the address specified in the Purchase Order no less than four working days prior to loading of the Work on any ocean going vessel for delivery to Westinghouse in the United States the following information in English: (1) Seller's full legal name and address, including country; (2) the full legal name and address, including country of the ship to party (the party first scheduled to receive the Work, including any equipment, material or other goods after release by US Customs and Border Protection upon entry into the United States of America); (3) the full legal name and address, including country, of the entity that manufactured, assembled, produced or supplied the Work, including any equipment, material or other goods in the country from which the foregoing are leaving; (4) a listing of the Work being shipped and corresponding Harmonized Tariff Code(s) to the first six digits and country of origin for each; (5) the full address of the location, including country, at which the container(s) in which the Work being shipped was loaded (6) the full legal name and address, including country, of the freight consolidator or other party that loaded the container(s) (7) the Ocean bill of lading and any "House" bill of lading number, booking number and estimated container(s) loading date(s) and Standard Carrier Alpha Code (SCAC); (8) vessel name, IMO number, estimate sail date, estimated arrival date, container(s) numbers, and voyage number; (9) the Purchase Order under which the Work is being delivered.

**16.5** Seller shall provide to Westinghouse the export control classification number (for example the ECCN or ECN) as defined under the export control regulations of Seller's country of nationality, upon the earlier of the shipment date or request by Westinghouse.

**16.6** For international shipments, Seller shall provide Westinghouse a commercial invoice or pro forma invoice, as appropriate, in a form and with all necessary data to comply with the requirements of the customs laws and regulations of the country to which the Work is to be delivered to Westinghouse, including the Harmonized Tariff Code(s) to the first six digits (regardless of legal requirements).  Seller shall provide at no additional cost or delay any required certification of origination to permit Westinghouse's claim for preferential duty or tariff treatment for the tangible portions of the Work with respect to free trade agreements, customs unions or similar international agreements governing Westinghouse and Seller.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

**Article 17 – Termination and Suspension**

Westinghouse may terminate or suspend the Purchase Agreement for its convenience, in whole or in part, at any time by written notice.  In such event, Seller shall promptly comply with the directions contained in such notice and shall, subject to such direction, (1) take all necessary action to terminate or suspend the Work as provided in the notice, minimizing costs and liabilities, (2) protect, preserve and deliver any property related to the Purchase Agreement that is in Seller's possession pursuant to Westinghouse's direction; and (3) continue the performance of such part of the Work, if any, as may not have been terminated or suspended by the notice; failure to continue the performance of such part of the Work, if any, as may not have been suspended shall be deemed to be a material breach of the Purchase Agreement.  If Seller at the time of such termination or suspension has in stock or on firm order any completed or uncompleted items or any raw, semi-processed or completed materials for use in fulfilling the Purchase Agreement that cannot be used by Seller for any other purpose, then: (1) in the case of completed items or materials, Westinghouse may either require delivery of all or part of the completed items or materials and make payment thereof at the purchase price or, without taking delivery thereof, pay Seller the difference, if any, of the purchase price over the market price at the time of termination, and (2) in the case of uncompleted items or raw or semi-processed materials, Westinghouse shall, at its option, either require Seller to deliver all or part of such items or materials at the portion of the purchase price representing their stage of completion or, without taking delivery thereof, pay Seller with respect to such items or materials as are properly allocable to the Purchase Agreement, a portion of the purchase price representing the state of completion of such items or materials, reduced by the higher of the market or scrap value of such items or materials at such stage of completion; and (3) in the case of items or materials which Seller has on firm order, Westinghouse shall, at its option, either take an assignment of Seller's right under such order or pay the costs, if any, of settling or discharging Seller's obligation under the Purchase Agreement.

Westinghouse shall have the right, by written notice to Seller, to terminate the whole or any part of the Purchase Agreement for default: (1) if Seller fails to deliver items and materials or to perform the services within the time or in the manner provided under the Purchase Order, (2) if reasonable grounds for insecurity arise with respect to Seller's performance and Seller fails to furnish adequate assurances within 10 Days after a written demand by Westinghouse for such assurance or (3) if Seller becomes insolvent or makes an assignment for the benefit of creditors, commits an act of bankruptcy or files or has filed against it a petition in bankruptcy or reorganization proceedings.  In the event Westinghouse terminates the Purchase Agreement, in whole or in part, for default, Westinghouse shall be entitled to all rights and remedies provided by law.

**Article 18 – Audit Rights and Quality Assurance**

**18.1**     Westinghouse shall have reasonable access during normal working hours and for a reasonable length of time to Seller's books or records, and all supporting documents thereto, insofar as such access is pertinent to support Seller's charges for cost-reimbursable Work performed under the Purchase Agreement.  Seller must ensure that the financial records and procedures adhere to generally accepted accounting practices ("GAAP") and principles.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

**18.2**    Seller represents that it has established and implemented a Quality Assurance Program.  Seller represents that the Quality Assurance Program meets Westinghouse's compliance requirements and the applicable requirements of the NRC related to quality control and quality assurance, including the requirements set forth in Title 10 of the Code of Federal Regulations, Part 50, Appendix B.  Seller shall, at its sole cost and expense, provide Westinghouse with a copy of the quality assurance manuals applicable to the Work.

**18.3**    Westinghouse shall, at its sole cost and expense, have access to Seller's manufacturing facilities where the Work is being performed for the purpose of quality assurance surveillance, the witnessing of the general performance of the Work and participating in specific witness points.  Westinghouse shall have the right to issue a stop-work order at any time Westinghouse determines that the Work is not in compliance with the Quality Assurance Program or other requirements of the Purchase Agreement. Seller shall compensate Westinghouse for its additional costs and expenses incurred as a result of such non-compliance by Seller, and Westinghouse shall not be obligated to compensate Seller for time, costs, damages or delays caused by such non-compliance nor shall such delays constitute grounds for any change or modification of the delivery schedule.

**18.4**    Westinghouse shall have the right to establish, under the Purchase Agreement, a separate and independent inspection and testing program for the Work.  Should Westinghouse establish such a program, Seller shall use its best efforts to cooperate in the performance of such program.  Should it be determined, as a result of such program, that the Work does not conform to the requirements of the Purchase Agreement, the Parties shall mutually agree as to method of correcting the nonconformance. Such program shall not in any way release Seller from its obligations under the Purchase Agreement.

**18.5**    Westinghouse shall have access to Seller's facilities for the purpose of auditing Seller's Quality Assurance Program and quality control records applicable to the Work.  Seller shall compensate Westinghouse for its additional costs and expenses incurred as a result of non-compliance by Seller with the Quality Assurance Program or inability to locate quality control records in a timely manner during the audit.  Seller shall retain the applicable quality control records in a form which minimizes the risk of their destruction or loss for the period of time specified in the applicable codes and standards.  Seller shall advise Westinghouse prior to disposal of such records.

**18.6**    The obligations contained in this Article shall apply to Seller's Subcontractors, and Seller must impose the same obligations on its Subcontractors through its agreements with its Subcontractors.

**18.7**    Seller's quality control and Quality Assurance Program must include provisions for non-safety related items within the scope of the Work.  The level of quality control provided in these areas need not meet the specific quality assurance requirements of Seller's Quality Assurance Program, but shall provide for an adequate level of quality in such areas.  Westinghouse shall be allowed access to Seller's facilities to inspect workmanship, observe tests and inspections, expedite delivery, and obtain required information for the Materials.  Seller shall use its best efforts to obtain for Westinghouse the same access rights at Subcontractors' facilities.

**18.8**    Subject to the confidentiality obligations of Article 14, Westinghouse shall have the right to make copies of or extracts from all financial and related records relating to or pertaining to this agreement kept by or under the control of Seller and/or Subcontractors.  Seller hereby agrees that Westinghouse may use the services of a third-party auditor provided such Third Party executes a

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

confidentiality agreement with Westinghouse limiting use of Seller's proprietary information to performance of the audit services and prohibiting further disclosure.

**18.9**     Seller shall respond to Westinghouse in writing to all audit findings within a reasonable amount of time from the receipt of the audit report.  Responses should include timelines and plans for closure of all corrective actions and commitments.

### Article 19 – Control of the Work; Independent Contractor

**19.1**     Control of the Work.  Seller shall be solely responsible for the performance of the Work and shall furnish the labor, tools, equipment and materials, and such other activities necessary to perform the Work properly and safely.  Seller shall be solely responsible for the actions of Subcontractors and their personnel.

**19.2**     Independent Contractor.  Seller is an independent contractor and nothing contained herein shall be construed as creating (a) any relationship between Westinghouse and Seller other than that of independent contractor; (b) any relationship whatsoever between Westinghouse and Seller's employees or Subcontractors; or (c) a fiduciary relationship between Seller and Westinghouse.  Neither Seller nor any of its employees are or shall be deemed to be employees of Westinghouse.

### Article 20 – Assignment

Seller shall not assign the Purchase Agreement in whole or part without Westinghouse's prior written consent.  Seller shall promptly notify Westinghouse in writing of any change in its status including, but not limited to bankruptcy, insolvency, change of ownership or control, strike or work stoppage.

### Article 21 – Notices

All notices, consents, communications, and approvals required or permitted to be given under the Purchase Agreement shall be in writing and shall be valid and sufficient if: (a) delivered in person or dispatched by certified mail (return receipt requested) to Westinghouse, or (b) delivered by electronic mail to Westinghouse, provided that the tracking option on such electronic mail is enabled to provide both a delivery receipt and a read receipt from the addressee (i.e., the sender will receive a return acknowledgement that the electronic mail has been received and read by the addressee).

### Article 22 – Publicity

Seller shall not, except with the express prior written consent of Westinghouse, in any manner advertise or publish or release for publication any statement or information mentioning Westinghouse, its parent, affiliates and or subsidiaries or the fact that the Seller has been furnished or has been contracted to furnish to Westinghouse the Work required by the Purchase Agreement.

### Article 23 – Anti-Bribery/Kickback

Seller represents, warrants and covenants that neither it nor any of its officers, directors, employees, agents, representatives or Subcontractors on its behalf will either make or promise to make any gift or payment of money or anything of value, directly or indirectly, to any other person for the corrupt

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

purpose of inducing such other person to misuse his or her position or to influence any act or decision to obtain, retain or direct business in connection with the Purchase Agreement.

Seller shall deliver annually or as requested by Westinghouse certifications of compliance with respect to this Article 23, as well as other reasonable assurances required by Westinghouse.  Any violation of this Article 23 by Seller shall give Westinghouse the right to terminate the Purchase Agreement.

## Article 24 – Intellectual Property Infringement Indemnity

**24.1**    Seller represents and warrants that all Work delivered or performed pursuant to the Purchase Agreement and the sale or use thereof do not infringe any Third Party's intellectual property rights, including but not limited to patent, trade secret, copyright or trademark rights.

**24.2**    Seller, at its sole expense, shall indemnify and defend, or at its option settle, any action brought against any one or more of Westinghouse and/or Westinghouse's customers to the extent based on a claim that all or any of the Work constitutes an infringement or misappropriation of any intellectual property rights of any Third Party.  Seller shall pay all of the damages, liabilities, costs, losses and expenses (including attorneys' fees) incurred in connection with any such claim against Westinghouse and/or Westinghouse's customers.

**24.3**    Westinghouse, at its option, may require Seller at its expense, to (a) procure for Westinghouse and/or Westinghouse's customers the right to continue using such Work; (b) replace such Work with a non-infringing item that meets all of the requirements of the Purchase Agreement; (c) modify such Work such that it becomes non-infringing while still meeting all of the requirements of the Purchase Agreement; or (d) refund the Purchase Price to Westinghouse upon return by Westinghouse to Seller of the infringing work.

## Article 25 – Westinghouse-Furnished Property

**25.1**    Any tools, patterns, equipment, material or other property which is supplied to Seller by Westinghouse ("Westinghouse-Furnished Property") shall not be used by Seller on any other work without the prior written consent of Westinghouse.

**25.2**    Title to Westinghouse-Furnished Property shall remain with Westinghouse.  Seller shall segregate and clearly mark Westinghouse-Furnished Property to show Westinghouse's ownership and shall preserve Westinghouse's title thereto free and clear of all encumbrances.  Should Westinghouse at any time have reason to believe that its title to, or right to the possession of, any Westinghouse-Furnished Property is threatened, Westinghouse shall have the right to enter upon Seller's premises and remove such property.  Westinghouse reserves the right to abandon Westinghouse-Furnished Property at no additional cost to Westinghouse upon issuance of written notification to Seller of such intent.

**25.3**    Seller shall, at its expense, perform all maintenance, repairs and replacements necessary with respect to Westinghouse-Furnished Property so that the same may remain suitable for the use contemplated by the Purchase Agreement and may be returned to Westinghouse in as good condition as when received, except for reasonable wear and tear or consumption of materials necessarily resulting from their use.

**25.4**    Seller waives any and all claims relating to loss, damage, injury or delay arising out of or related to Westinghouse-Furnished Property and Seller shall indemnify Westinghouse against any and all

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

liability for damage to property or injury to or death of persons arising from or incidental to the presence or use of Westinghouse-Furnished Property, whether such damage, injury or death be caused by defects in such property, negligence in the use thereof, strict liability or otherwise.

**Article 26 – Compliance with Export Control Laws and Regulations**

The Parties agree not to disclose, transfer, export, or re-export, directly or indirectly, any and all Proprietary Information, Westinghouse Background Information, Seller Background Information, Foreground Information, Third Party Information, Westinghouse Furnished Property, Materials, Services or Work, or any portion thereof received from the other Party, or any direct products or technology resulting therefrom ("Items") to any country, natural person or entity, except in accordance with applicable export control laws, specifically the U.S., the E.U. (including the European Community, EC 428/2009), and other applicable government export control laws and regulations ("Applicable Laws"). To assure compliance with the Applicable Laws of the United States Government, specifically the U.S. Department of Energy export regulations of nuclear technology under 10 C.F.R. Part 810 (U.S. Code of Federal Regulations), the Nuclear Regulatory Commission export regulations under 10 C.F.R. Part 110, the U.S. Department of Commerce export regulations of commercial or dual use items under 15 C.F.R. 730 et seq., and the U.S. Department of Treasury's sanctions programs and sanctions lists, the Seller shall not disclose, transfer, export, or re-export, directly or indirectly, any Item it receives hereunder without the prior written permission of Westinghouse, which may be contingent on additional United States Government and other applicable government approvals.   The Seller represents and warrants that (i) neither Seller nor its personnel (including its employees, contractors, officers, directors and principal owners) are currently included in any published lists maintained by the governments of the U.S., E.U. and other countries and international organizations of persons and entities whose export or import privileges have been denied or restricted, (ii) Seller will not use the Items in any activity prohibited by 15 C.F.R. Part 744, including without limitation nuclear, chemical, or biological weapons proliferation activities, and (iii) the Seller will not disclose Items to any countries for which the U.S., the E.U. and other applicable governments maintain an embargo or to citizens or residents thereof if prohibited by such embargo.  Notwithstanding the foregoing, subject to Article 14, Seller may transfer or re-export Items to approved affiliates and sub-suppliers provided that such recipients are located in the same country as the Seller or Westinghouse and the recipient is not included in any published lists of natural persons and entities whose export or import privileges are in any way restricted, which are maintained by the United States, the European Union, or other countries and international organizations.  The Seller shall fully comply with all such laws and regulations with regards to the Items it receives hereunder and shall cooperate in good faith with the reasonable requests of Westinghouse made for purposes of its compliance with such Applicable Laws.  Notwithstanding any other provisions in this Agreement, the obligations set forth in this Article 26 shall survive so long as the relevant Applicable Laws are in effect.

**Article 27 - Environment, Health and Safety**

**27.1**      Seller shall take appropriate actions necessary to protect health, safety and the environment, including, without limitation, in the workplace and during transport of the Work and has established an effective program to ensure any Subcontractors it uses to perform the Work will be in compliance with this Article 27.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

**27.2**      Seller warrants that each chemical substance constituting or contained in Materials sold or otherwise transferred to Westinghouse is suitable for use and/or transport in any jurisdiction to or through which Westinghouse informs Seller the Material will likely be shipped or to or through which Seller otherwise has knowledge that shipment will likely occur and is listed on or in: A) the list of chemical substances compiled and published by the Administrator of the U.S. Environmental Protection Agency pursuant to the U.S. Toxic Substances Control Act ("TSCA") (15 U.S.C. § 2601), also known as the TSCA Inventory, or exempted from such list under 40 C.F.R. 720.30-38; B) the Federal Hazardous Substances Act (P.L. 92-516) as amended; C) the European Inventory of Existing Commercial Chemical Substances ("EINECS") as amended; D) the European List of Notified Chemical Substances ("ELINCS") and lawful standards and regulations thereunder; or e) the People's Republic of China's Inventory of Existing Chemical Substance in China ("IECSC"); or (f) any equivalent or similar lists in any other jurisdiction to or through which Westinghouse informs Seller the Materials will likely be shipped or to or through which Seller otherwise has knowledge that shipment will likely occur.

**27.3**      Seller warrants that each chemical substance constituting or contained in Materials sold or otherwise transferred to Westinghouse: A) is properly documented and/or registered as required in the jurisdiction to or through which Westinghouse informs Seller the Materials will likely be shipped or to or through which Seller otherwise has knowledge that shipment will likely occur, including but not limited to pre-registration and registration if required, under Regulation (EC) No. 1907/2006 ("REACH"); B) is not restricted under Annex XVII of REACH or other similar legislation in any country through which Westinghouse informs Seller the Equipment will likely be shipped or to or through which Seller otherwise has knowledge that shipment will likely occur; and C) if subject to authorization under REACH or similar legislation, is authorized for Westinghouse's use.  In each case, Seller shall provide Westinghouse with supporting documentation prior to delivery or transfer and timely upon request, including but not limited to, 1) pre-registration numbers for each substance; 2) the exact weight by weight percentage of any REACH Candidate List (defined below) substance constituting or contained in the Materials; 3) all relevant information that Westinghouse needs to meet its obligations under REACH to communicate safe use to its customers; 4) the documentation of the authorization for Westinghouse's use of an Annex XIV substance; and (5) any other information related to the composition and/ or authorization of use the Equipment.  Seller shall notify Westinghouse if it decides not to register substances that are subject to registration under REACH and are constituting or contained in Materials supplied to Westinghouse at least 18 months before their registration deadline. Seller must monitor the publication by the European Chemicals Agency of the list of substances meeting the criteria for authorization under REACH (the "Candidate List") and immediately notify Westinghouse if any of the Materials supplied to Westinghouse constitute or contain a substance submitted and/or proposed for listing on the Candidate List.  Seller shall provide Westinghouse with the name of the substance and sufficient information to allow Westinghouse to safely use the Materials and fulfill Westinghouse own obligations under REACH.

**27.4**      Seller warrants that none of the Materials sold or transferred to Westinghouse contain any: A) of the following chemicals: arsenic, asbestos, benzene, beryllium, carbon tetrachloride, cyanide, lead or lead compounds, cadmium or cadmium compounds, hexavalent chromium, mercury or mercury compounds, trichloroethylene, tetrachloroethylene, methyl chloroform, polychlorinated biphenyls ("PCBs"), polybrominated biphenyls ("PBBs"), polybrominated diphenyl ethers ("PBDEs"); B) chemical or hazardous material otherwise prohibited pursuant to Section 6 of TSCA; C) chemical or hazardous

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

material otherwise restricted pursuant to EU Directive 2011/65/EU (21 July 2011) (the "RoHS Directive"), as amended; (D) chemical or hazardous otherwise restricted pursuant to China's Management Methods for Control of Pollution Caused by Electronic and Electrical Products ("China RoHS"); (E) designated ozone depleting chemicals as restricted under the Montreal Protocol (including, without limitation, 1,1,1 trichloroethane, carbon tetrachloride, Halon-1211, 1301, and 2402, and chlorofluorocarbons ("CFCs") 11-13, 111-115, 211-217); F) substance listed on the REACH Candidate List, subject to authorization and listed on Annex XIV of REACH, or restricted under Annex XVII of REACH; or F) other chemical or hazardous material the use of which is restricted in any other jurisdiction to or through which Westinghouse informs Seller the Materials are likely to be shipped or to or through which Seller otherwise has knowledge that shipment will likely occur, unless with regard to all of the foregoing, Westinghouse expressly agrees in writing and Seller identifies an applicable exception from any relevant legal restriction on the inclusion of such chemicals or hazardous materials in the Materials sold or transferred to Westinghouse.  Upon request from Westinghouse and subject to reasonable confidentiality provisions that enable Westinghouse to meet Westinghouse's compliance obligations, Seller shall provide Westinghouse with the chemical composition, including proportions and weights, of any substance, preparation, mixture, alloy or goods supplied under the Purchase Agreement and any other relevant information or data regarding the properties, including without limitation test data and hazard information.

**27.5**     Seller warrants that, except as specifically listed on the Purchase Order or in an applicable addendum, none of the Materials supplied under the Purchase Agreement are electrical or electronic equipment or batteries or accumulators as defined by laws, codes or regulations of a jurisdiction to or through which Westinghouse informs Seller the Materials are likely to be shipped or to or through which Seller otherwise has knowledge that shipment likely will occur, including but not limited to EU Directive 2012/19/EU (24 July 2012) (the "WEEE Directive"), as amended and EU Directive 2006/66/EC (26 September 2006) (the "Batteries Directive"), as amended and/or any other legislation or regulation providing for the taking back of such electrical or electronic equipment or batteries or accumulators (collectively, "Take-Back Legislation").  For any goods specifically listed on the Purchase Order or in such addendum as electrical or electronic equipment or batteries or accumulators that are covered by any Take-Back Legislation , Seller shall: A) assume responsibility for taking back such goods in the future upon the request of Westinghouse and treating or otherwise managing them in accordance with the requirements of applicable Take-Back Legislation; B) take back as of the date of the Purchase Agreement any used goods currently owned by Westinghouse of the same class of such Materials purchased by Westinghouse under the Purchase Agreement up to the number of new units being purchased by Westinghouse or to arrange with a Third Party to do so in accordance with all applicable requirements; and C) appropriately mark and/or label the goods as required by any applicable Take-Back Legislation. Seller shall not charge Westinghouse any additional amounts, and no additional payments shall be due from Westinghouse for Seller's agreement to undertake these responsibilities.

**27.6**     Seller warrants that all Materials conform with applicable Conformité Européenne ("CE") directives for goods intended for use in the EU, including those regarding electrical and electronic devices, machinery and pressure vessels/equipment.  Seller shall affix the CE mark on Materials as required.  Seller shall provide all Documentation required by the applicable CE directives, including but not limited to Declarations of Conformity, Declarations of Incorporation, technical files and any documentation regarding interpretations of limitations or exclusions.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

**27.7**     With respect to any Materials sold or otherwise transferred to Westinghouse under the Purchase Agreement, Seller shall notify Westinghouse in writing of the presence of any engineered nanoscale material (defined for these purposes as any substance with at least one dimension of such substance known to be less than one hundred (100) nanometers in length).  With respect to all such nanoscale material(s), Seller shall provide a description of its regulatory status and any safety data or other notifications that are appropriate in the EU, U.S. and any other jurisdiction to which Westinghouse informs Seller the Materials will be shipped or to which the Seller otherwise has knowledge that shipment will likely occur.

**27.8**     With respect to Materials sold or otherwise transferred to Westinghouse under the Purchase Agreement, Seller shall provide all relevant information, including but not limited to, safety data sheets in the language and legally required format of the location to which the Materials will be shipped and mandated labeling information, required pursuant to applicable requirements such as: A) the United Nations Globally Harmonized System of Classification and Labeling of Chemicals (GHS) or similar legislation; B) the Occupational Safety and Health Act ("OSHA") regulations codified at 29 C.F.R. 1910.1200, as amended; C) EU REACH Regulation (EC) No. 1907/2006, EU Regulation (EC) No. 1272/2008 classification, labeling and packaging of substances and mixtures ("CLP"), EU Directives 67/548/EEC and 1999/45/EC, as amended, if applicable; D) any applicable labeling and information disclosure requirements of China's Management Methods for Control of Pollution Caused by Electronic and Electrical Products ("China RoHS"); and E) any other applicable law, rule, or regulation or any similar requirements in any other jurisdictions to or through which Westinghouse informs Seller the Materials are likely to be shipped or through which Seller otherwise has knowledge that shipment will likely occur, such as the U.S. Department of Transportation regulations governing the packaging, marking, shipping and documentation of hazardous materials, including hazardous materials specified pursuant to 49 C.F.R., the International Maritime Organization ("IMO"), the International Air Transport Association ("IATA").

**27.9**     Seller will remove and dispose of all chemical substances and/or mixtures, containers, materials and residue from their use, in accordance with all applicable statutes, laws, regulations, rules, orders and ordinances at Seller's facilities, Westinghouse facilities, and Westinghouse's customer facilities.

**27.10**     Seller warrants that all of the Materials furnished under the Purchase Agreement have been completely and accurately labeled pursuant to the requirements of 40 C.F.R. Part 82, "Protection of Stratospheric Ozone" or that the Materials do not require such labeling.

### Article 28 – Counterfeit, Fraudulent, and Suspect Items

28.1 Counterfeit, Fraudulent and Suspect Items ("CFSI") refers to goods that may be (1) mis-labeled as to source or quality, (2) falsely labeled as new, (3) fraudulently stamped or identified as having been produced to high or approved standards, (4) an unauthorized copy of a known product within the industry, or (5) materially misrepresented in some way by the supplier.  All CFSI are rebuttably presumed to be not in conformance with the requirements of the Purchase Agreement.

**28.2** Seller shall implement a program, applicable at all levels of supply, to document the sourcing of all items and components, and to ensure that CFSI is not delivered or incorporated into the Work.  In this regard, Seller shall only incorporate equipment and components that are traceable back to the Original

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

Equipment Manufacturers ("OEM", Original Component Manufacturers ("OCM"), or their respective authorized distributors.  This traceability process shall include traceability to documentation and/or associated certification developed by manufacturers including clear identification of the name and location of all supply chain intermediaries from the manufacturer to the direct source of the product for the Seller.  Deviations from this general standard must be approved in writing by Westinghouse.  Sellers shall require flow down of these requirements to subcontractors and sub-suppliers at all levels.

**28.3** If Seller becomes aware or suspects that it has furnished CFSI in any form, Seller shall immediately notify Westinghouse in writing with the pertinent facts and Seller shall immediately: (1) provide OCM/OEM documentation that authenticates the traceability of the items in question and a certificate of conformance evidencing compliance with the requirements of the Purchase Agreement; or (2) promptly replace the CFSI with items acceptable to Westinghouse at Seller's sole cost and expense.  These costs include, but may not be limited to costs of removing CFSI, costs of reinserting replacement parts, any testing necessitated by the reinstallation of replacement parts after CFSI has been exchanged, travel expenses, legal expenses, shipping costs, fines or penalties, labor, replacement materials, impoundment and administrative expenses.

**28.4** If Westinghouse, at any time, has reasonable cause to believe Seller has furnished CFSI, in any form, Westinghouse shall notify Seller and Seller shall immediately: (1) provide OCM/OEM documentation that authenticates the traceability of the items in question and a certificate of conformance evidencing compliance with the requirements of the Purchase Agreement; or (2) promptly replace the CFSI with items acceptable to Westinghouse at Seller's sole cost and expense.  These costs include, but may not be limited to costs of removing CFSI, costs of reinserting replacement parts, any testing necessitated by the reinstallation of replacement parts after CFSI has been exchanged, travel expenses, legal expenses, shipping costs, fines or penalties, labor, replacement materials, impoundment and administrative expenses.

**28.5** For a comprehensive description of measures to prevent CFSI, see Electric Power Research Institute (EPRI) Technical Report 1019163 "Plant Support Engineering: Counterfeit and Fraudulent Items – Mitigating the Increasing Risk" Reference Number 3002002276.

**Article 29 – Prohibited Materials**

Unless otherwise specified on Westinghouse's specification or the Purchase Order, Seller represents and warrants that the following materials shall not be used in the fabrication or finish of, or be present in, any Materials supplied to Westinghouse under the Purchase Agreement: any conflict minerals of which the source is determined to be located in the Democratic Republic of Congo (DRC) or adjoining countries (Angola, Congo, Central Africa Republic, Sudan, Uganda, Rwanda, Burundi, Tanzania, and Zambia).  The conflict minerals are currently coltan, cassiterite, gold or wolfermate as determined under the Dodd-Frank Wall Street Regulation and Consumer Protection Act, from time to time.  Seller is responsible for remaining informed of any changes in the conflict minerals implementing regulations of the Dodd-Frank Wall Street Regulation and Consumer Protection Act so that its representation is valid as of the time of supply of any Materials to Westinghouse under the Purchase Agreement.  Westinghouse may at its option require objective evidence to substantiate that these materials are not present.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

**Article 30 – Safety Conscious Work Environment (SCWE)**

**30.1** Protected Activity. To the extent required by applicable law, Seller and its personnel shall comply with the requirements of Section 211, "Employee Protection" of the Energy Reorganization Act of 1974, 42 U.S.C. §5851, as amended, and 10 C.F.R. §50.7, "Protection of Employees Who Provide Information" and 29 C.F.R. §24, which prohibit Nuclear Regulatory Commission (NRC) licensees or their contractors or subcontractors from discriminating against an employee for engaging in protected activities. Discrimination includes discharge, or other adverse or retaliatory action that relates to compensation, terms, conditions, and privileges of employment; and protected activities include raising nuclear safety or quality issues internally to licensee, contractor or subcontractor management or directly to the NRC.

**30.2** Safety Conscious Work Environment. Westinghouse is committed to safe operations, a strong nuclear safety culture and to maintaining a Safety Conscious Work Environment ("SCWE") in connection with its operations and its nuclear and quality work activities. To this end, Westinghouse adheres to the INPO® Principles for a Strong Nuclear Safety Culture and the use of Human Performance Tools, and it requires its suppliers of any tier to demonstrate commitment and adherence to and practice of these principles and tools. Accordingly, Seller shall demonstrate its commitment to and maintain an SCWE, shall implement an SCWE program at its facilities and shall follow Westinghouse's or Westinghouse Customer's SCWE program for work at Westinghouse Customer's site. An SCWE program is one in which Seller and all of its personnel and the personnel of its lower-tier suppliers and subcontractors are informed and are entitled and encouraged to raise safety and quality concerns to Seller's management, to Westinghouse or to Westinghouse's Customer without fear of retaliation or other discrimination. Nothing herein is intended to be construed to inhibit or otherwise prevent any of Seller's personnel or other person from communicating directly with any federal or state agency, including without limitation the NRC and/or the U.S. Department of Labor (DOL), regarding a safety or quality concern or any other matter.

**30.3** Notice of Seller's Personnel Concerns. Seller shall promptly (but in no event later than 5 working days) notify Westinghouse after any concern is received by the Seller or brought to the Seller's attention from Seller's personnel (or former personnel) or the personnel (or former personnel) of its lower tier suppliers or subcontractors of: (i) an allegation in connection with the work of discrimination or retaliation because of engagement in protected activities; or (ii) notice of filing of a Section 211 complaint with the DOL; or (iii) notice of an investigation related to the filing of an allegation or Section 211 complaint by the NRC or the U.S. Occupational Safety and Health Administration (OSHA). Moreover, Seller shall promptly and aggressively investigate, or shall ensure that its lower-tier supplier or subcontractor promptly and aggressively investigates, any and all allegations that include a charge that any Seller or its lower tier supplier or subcontractor personnel (or former personnel) have been discriminated or retaliated against for engaging in protected activity, shall cooperate fully with Westinghouse to assure a complete investigation of such allegation, including providing Westinghouse with any [non-privileged] information that it includes in any report it may prepare or which may be prepared by the NRC, the DOL or OSHA, and shall provide Westinghouse with a full written description of any action which may be taken in response to any such allegation or complaint.

**30.4** Further Information; Audit. If Seller requires further information or clarification regarding these requirements or Westinghouse's expectations, it is Seller's responsibility to contact Westinghouse to

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

seek such information and/or clarification or information on Westinghouse's SCWE policies or programs. Westinghouse [and Westinghouse's Customer] shall have the right to audit the effectiveness of such programs not less than once every twelve (12) months during the term of the Purchase Agreement.  If Westinghouse determines through any such audit that there are deficiencies in the implementation and practice of Seller's SCWE program, Seller shall undertake appropriate corrective actions to Westinghouse's reasonable approval.

**30.5**   <u>Material Breach</u>.  Any breach of these provisions shall be deemed a material breach of the Purchase Agreement.  In the event that NRC imposes a civil penalty against Westinghouse or Westinghouse's Customer as a result of Seller's breach of these provisions, such civil penalty may be considered by the Parties to be direct damages and not consequential, special or indirect damages under this Purchase Agreement.

**30.6**   <u>Flow-Down Requirement</u>.  Seller shall include the foregoing provisions into each of its lower-tier contracts or subcontracts for the performance of nuclear safety or quality work in connection with the Purchase Agreement, and Seller shall be responsible for ensuring compliance by its lower-tier suppliers and subcontractors.

## Article 31 – Order of Precedence

In the event of conflict among the various documents of the Purchase Agreement, the conflict shall be resolved according to the priority identified below:

1. Westinghouse's Change Notices, with the most recent dated documents taking precedence over earlier documents

2. Westinghouse's Purchase Order

3. These Terms and Conditions

4. Westinghouse's Purchase Order Attachments and Schedules

5. All other documents to the Purchase Agreement

Any amendment will have priority over the document it amends, and any amended document will have the same precedence as stated in this provision.  The various documents constituting the contractual obligations between the Parties shall, insofar as is possible, be so interpreted as to be consistent with one another.

## Article 32 – Governing Law and Venue

The Purchase Agreement shall be governed by the laws of the Commonwealth of Pennsylvania, USA, excluding its rules and laws governing choice of laws as well as the United Nations Convention on Contracts for the International Sale of Goods.  Seller hereby: (i) submits to the exclusive jurisdiction of the federal or State courts located in Allegheny County, Pennsylvania in any litigation, suit, action or proceeding arising out of, or relating to, the Purchase Agreement; (ii) knowingly, voluntarily and irrevocably consents to the personal jurisdiction and venue of said court; and, (iii) waives any right to dismiss or transfer it may have based on improper venue or *forum non conveniens* to the conduct of any proceeding in said court.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

Seller expressly waives any right to a trial by a jury in any proceeding arising directly or indirectly out of the Purchase Agreement

### Article 33 – Severability

If any provision of the Purchase Agreement or the application of the Purchase Agreement to any person or circumstance shall to any extent be held invalid or unenforceable by a court of competent jurisdiction or otherwise, then: (a) the remainder of the Purchase Agreement and the application of that provision to persons or circumstances other than those as to which it is specifically held invalid or unenforceable shall not be affected, and every remaining provision of the Purchase Agreement shall be valid and binding to the fullest extent permitted by law, and (b) a suitable and equitable provision shall be substituted for such invalid or unenforceable provision in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision.

### Article 34 – Resolution of Conflicts or Inconsistencies

If Seller discovers any errors, omissions, discrepancies or conflicts in any part of the Purchase Agreement, including these Terms and Conditions, it shall immediately so inform Westinghouse in writing.  Westinghouse shall promptly correct and/or clarify such matters and so inform Seller. Westinghouse's decision shall be binding, and Seller shall proceed with the applicable portion of the Work only after such information has been supplied by Westinghouse.  Should Seller fail to contact Westinghouse to resolve any such conflicts or inconsistencies, Seller shall be solely responsible for any errors resulting from any conflicts or inconsistencies occurring in the Purchase Agreement.  Where documents are referenced, the issue date in effect as of the date Effective Date of the Purchase Order or Change Notice placement shall be applicable, unless another issue date is specified in the Purchase Order or Change Notice.

### Article 35 – No Waiver

Neither shall the failure of either Party to enforce at any time any of the provisions of the Purchase Agreement be construed as a waiver of such provision nor shall it in any way affect the validity of the Purchase Agreement or the right of either Party to enforce each and every provision.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

CTR-PO-2013-011 Rev4 (Feb2017)

**Article 36 – Survival**

The Parties agree that the provisions of Article 6 – Payment; Article 7 – Taxes; Article 10 – Performance Standards; Seller's Warranties ; Article 11 – Indemnity; Article 12 – Insurance; Article 13 – Liens; Article 14 – Proprietary (Confidential) Information; Article 15 – Ownership of Intellectual Property; Article 17 – Termination and Suspension; Article 18 – Audit Rights and Quality Assurance; Article 21 – Notices; Article 23 – Anti-Bribery/Kickback; Article 26 – Compliance with Export Control Laws and Regulations; Article 27 – Environment, Health and Safety; Article 28 – Counterfeit, Fraudulent, and Suspect Items; Article 30 – Safety Conscious Work Environment (SCWE); Article 32 – Governing Law and Venue; this Article 36 – Survival, and any other terms and conditions of the Purchase Agreement that by their context are intended to survive or which are expressly stated to survive shall survive or limit the liability of Westinghouse shall survive termination, cancellation or expiration of the Purchase Agreement.

© 2017 Westinghouse Electric Company LLC All Rights Reserved

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

WESTINGHOUSE ELECTRIC
COMPANY LLC

               Plaintiff,

    v.

DATADIRECT NETWORKS, INC.

               Defendant.

CIVIL DIVISION

No.: GD: 19-

Code No. 010

**JURY TRIAL DEMANDED**

## <u>VERIFICATION</u>

I, David M. Annal, Information System Consultant at Westinghouse Electric Company LLC, have reviewed the foregoing Complaint. The averments of fact made therein are true and correct based upon my knowledge, information and belief.  I understand that false statements herein are made subject to penalty of 18 Pa. Cons. Stat. Ann. § 4904 relating to unsworn falsification to authorities.

Date: _10/4/2019_

_____
David M. Annal

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Frank H. Stoy

Signature: _____

Name: Frank H. Stoy

Attorney No.: 314588

1

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Complaint has been served

this 7th day of October, 2019 via United States Certified Mail upon the following:

Guy Colpitts, Esquire
DataDirect Networks, Inc.
2929 Patrick Henry Drive
Santa Clara, CA 95054
(*General Counsel Defendant DataDirect Networks, Inc.*)

Frank H. Stoy

Doc. #4982089